City of Newark Case Newark Cab Association v. City of Newark 17-1358 Thank you, your honors. May it please the court. I ask to reserve three minutes for rebuttal. That will be granted. Thank you, your honor. My clients paid the City of Newark a substantial fee and agreed to be subject to stringent and expensive regulations with the expectation of some value in return. What was that value that you expected in return? I guess the question is property. That's the question. Is the medallion or the expectation property? Which I think is the one that's been argued. What their expectation was, what the value was, was they expected to get something of value. Maybe not exclusive, although it certainly can be argued. It's a reasonable expectation. You still got your medallion. It's a matter of diminution of value of the medallion. The problem is, yes, we still have a medallion, but the value of the medallion, the expected value that they were supposed to get, which when we're talking about regulation, essentially... Counsel, if you could just answer. The Concrete Pipe case cited by your adversary, you didn't seem to address it, but I'm quoting it. Near diminution of value of property, however serious, is insufficient to demonstrate a taking. That goes to your Fifth Amendment claim. How do you get around that? It's more than a diminution of value. This is an essential taking of something from the specific municipality that granted it. I thought you agreed they didn't take it. You've got the medallion. It's the diminution of the value of the medallion that you're upset about. They more than did that. What they did is they've given our opposition the absolute ability at any time to take the entirety of that value. More than a diminution of value, as our complaint said, the value went down 70% in what they're now taking, and the value of the medallion went down over 50%. The reason the value of the medallion decreased so precipitously was because the market was flooded with new cars to transport people, right? Correct. What if Newark had flooded the market with new cars to transport people by increasing the cap on medallions from 600 to 6,000? Do you still have a case? Yes, we do. In that particular case, it would be less of a case because your expectation as to what you're going to get, the value you're going to get, you would expect that at some point, I would argue and concede that at some point you would expect that the city may increase the number of cars available. Why would you expect that? The whole reason medallions did skyrocket in value over time was because they were capped. Isn't that a fact? That is correct. It's more than that. The whole consistent increase in the value of medallions, not only in Newark but in other cities throughout the country, was changed when the market was flooded with new drivers, right? It was but other states and I argue what Newark did is they went two steps above because they made the taxi cabs, the TNT cabs, not subject to the regulatory scheme. They also have given those TNCs, in this case it's Uber. But they do that when they put livery cars on the street, when they issue limousine permits, right? The same phenomenon occurs, right? I represent the limousine company in this case also. That's one of my clients and they have strict regulations also. But they're regulated differently, as Judge Jordan has said, right? They're regulated slightly differently but they still have to get the fingerprinting of the individual drivers. They still have to get their vehicles inspected on a more regular basis and one of the biggest expenses is the carrying of insurance. They have to have insurance at all times. So you've shown pretty clearly that this is not a fair fight and your clients are being subjected to what some might call hyper-regulation at the same time that Newark has allowed a different industry to come in and to be barely regulated or probably from your perspective essentially unregulated. So it's just not a level playing field in terms of competition. Absolutely correct. And they go even a step further because our prices are regulated and they're advertised. Whereas Uber, according to the new regulations in the state, any information they give us to the prices, etc., that are given to the Department of Transportation are confidential. So anytime they want to completely put my clients out of business, they can start advertising saying, it costs you $50 to take a cab from Newark to Penn to downtown Manhattan, whereas we'll charge $25. Don't you have to make the case though? Because now you've sort of shifted from your takings argument to your equal protection argument, your assertion that you're being treated unfairly. And on that front, don't you have to show that the city's differential treatment is irrational? There's no rational basis for looking at the Uber folks as different than taxicabs. And there absolutely is no rational basis to look at them as different, other than that they're getting paid $10 million over seven years to do so. They provide the same service. They are not regulated with regard to safety as stringently as the taxicabs are. There's no question that there are differences. As Judge Hardin has pointed out and you have pointed out very strongly in your briefing, nobody's suggesting that they aren't being treated differently. They certainly are being treated differently. Why don't you speak though to the differences that, for example, the Seventh Circuit pointed out in the Illinois transportation case, where they said, look, there's a contractual relationship that's established. They're not able to take people who hail them on the street. They have certain other things that have to do with knowing the driver, knowing the record, et cetera. You know the price before you get in the cab because it's noted. You have a time estimate on your travel time. These things make it a different animal, like livery is different from cabs. This is different from livery and cabs. Speak to those differences because the Seventh Circuit relied on them. The district court evidently relied on them here. What's wrong with a regulatory authority saying we want more competition and we're prepared to make distinctions to get it? Let's talk about those differences that have been pointed out and especially pointed out in the briefs. I break it down into three specific categories. The first is that the fares are not set by the city. Now, that is a difference created by the regulation itself, which should not be considered as a difference, as was pointed out in the Boston taxi case by Judge Horton. The second one is the preexisting contractual relationship. We're now being governed by the state law, which is a different issue, but with regard to the state law specifically, the only information that is provided by the law that is required to be provided is a picture of the driver, the license plate number, not even the fare, not even the prearranged fare. If you compare that to taxis, in a taxi, you know what the fare is because it's regulated. Let's face it, we're talking about Newark taxi. Most of the taxis are dealing with the airport. At the airport, you have somebody at the taxi stand. They tell you exactly what the fare is going to be. You also have the train station, in fairness. Correct, but the majority of the work is being done from the airport, and quite honestly, the way that the statute now breaks down with regard to Newark, although it's very convoluted, I think it only applies to the airport. So when you get in a cab at the Newark airport and you're going to Haddonfield, New Jersey, you know exactly what it's going to cost? Right there. How much it is, or you could ask the person. Where is it listed? It gives you the fare, how much the fares are going to be, plus you have the... It just lists every municipality in New Jersey? Not every municipality, but you can look it up by the taxi stand driver, but it lists the major ones like Manhattan, Barclay Center, various other sites, and those are all flat rates. I guess what I'm asking is, does the customer have to do the mileage times the rate calculation, or are they flat rates? They would have to do the mileage, or they could ask the attendant. We'll tell them exactly how much. Counsel, we did ask you to comment on the new law. Does it apply in this case? How does it apply? Okay. All right. I'll come back to the last argument later. But does it apply? I'm not exactly sure. Because there's an agreement here, right? Excuse me? Because there's an agreement here, right? There is an agreement, and the agreement itself says that if the state enacts a law, the agreement becomes null and void except for the payment of $7 million over 10 years. However, the agreement also says that the terms of the agreement are amended to whatever the state says. Now, the state law says that there is nothing in the state law that supersedes a prior agreement for a class A city that has an airport. There's only one. But it also says that there can be no payment only by a TNC driver to the municipality, yet the payments are still being made. So the question is, why are the payments being made? The question for us is, does that state law moot this case or somehow affect our ability to address the issue you've raised? Because you've pinned it on the city of Newark's regulatory approach, and now the query, does the state law that's been enacted knock that regulatory approach away? The answer I would argue here today is no, because the city of Newark is still getting paid. And if they're getting paid $10 million over seven years, whether they're using the state law approaches or whether they're using this agreement, they're getting paid for something. And what are they getting paid? They're getting paid for an access agreement to an airport which is not owned by the city of Newark. It is, in fact, owned and regulated by the Port Authority. Can I ask this? Hold on just a second. So is your position on the mootness question, it doesn't even matter what the exact contours of the city's regulation or agreement are. There's still some kind of an agreement that's allowing them, Uber, to function in a way that's different from the cabs and reducing the value of the medallions. Absolutely. Absolutely. And being treated separately when there is no legitimate separate separation between the two of them. I see my time is up unless you have anything. We're hearing on rebuttal. Okay. Thank you. May I please record? My name is James Alexander Lewis V. I'm here on behalf of the city of Newark. And as the first matter I want to address today, since the court actually sent correspondence in connection with the New Jersey Transportation Network Company Safety and Regulatory Act, I think it does preempt here. There's language in there. Even if it's not completely preempting, this actual litigation speaks to this case and the allegations that are being made against the city here. First and foremost, there's language that suggests, flat out in the statute, that TNCs are qualitatively different than taxi cabs. Plaintiff's case rises and falls on the notion that TNCs and taxi cabs are exactly the same. Their equal protection argument is all up and through that actual argument that they're making. So if the state has already put language out there that says that that's just not the case, in addition to the Seventh Circuit precedent that you spoke about, I think that there's really no argument to be made at this juncture that taxi cabs are the same, for purposes of equal protection analysis, as TNCs. But are you saying this case is moot? Like we just have a baseline. Do we have authority to decide this case question? Does this state statute mean that whatever the agreement was or whatever the regulatory regime was from the city of Newark is just no longer in force? I mean, is the city saying, hey, we're out of it now, or are you not saying that? Because if you're saying we're out of it now, well, then that makes for an interesting question. But I'm not quite sure I'm hearing you say that. You're not disclaiming regulatory authority because the state has acted, are you? I think that the statute in and of itself, it states here, and of course they latch onto this language here, that there's an exception made if there's a prior agreement where there's an international airport present. That applies to Newark. But what's unclear to me is what does that exception mean? The statute also says it's the exclusive authority as it relates to representing TNCs. So that language, I think, taken by itself in a lot of ways preempts this litigation. However, we decide to interpret the language at the tail end of this actual statute that suggests that, okay, if you have an agreement, we're not going to, in essence, disabuse ourselves of that agreement. So with that agreement intact and the statute still in place, this language that says that this is the exclusive regulation as it relates to TNCs, I think isn't controlling and can't be just knocked about in order for the plaintiffs to make their case here today. But your position here today is we are still in the driver's seat, so to speak, when it comes to regulating the cabs and Uber and delivery people. The statute, the newly enacted state statute, has not taken us out of that regulatory position. We're still doing it. Now, maybe the things were said in the statute that affect how we decide this case, but you're still in a regulatory position and you're, in fact, still regulating just the same way you were before the statute. Have I understood that correctly? So I think I just need to make a bit of a distinction in connection with your question in the sense that we are absolutely regulating the taxi cabs, but I think what this discussion is about is whether or not we have any regulations that are directly going to be preempted by this as it relates to the TNCs. And I think the only discussion that's been had from the city in connection with the TNCs is by way of agreement. There's no regulation outside of what we were talking about in connection with the agreement. So that's the distinction. My bad use of the word regulation there. You've got an agreement which, in effect, says how you're going to treat them, right? So it's got the effect of a regulation by agreement, right? Perhaps. Okay. And that remains in effect even after the city's position is that agreement is still going on because the statute even says in it, you know, this doesn't affect the preexisting agreement for a class A city with an airport, i.e. Newark, right? That's my interpretation of the statute. Okay. Thanks. So let's talk about the medallions because they did appreciate pretty substantially over time, right? They did appreciate, correct. Appreciate. Oh, appreciate, yes, they did. For a number of years they were appreciating in value because they were capped. There was rationing by your client, right? Your Honor, the appreciation and depreciation of the value of the medallions, I think, is connected to market forces. There's nothing that they did. Right, particularly the rationing. When you say we're only going to have 600 medallions in Newark and more commerce occurs in 2005 than occurs in 1975 and there are more people and more commerce, those become more valuable. That's what happened, right? Well, there's a cap, correct, Your Honor. It didn't necessarily impact the value of the medallions. And you would concede, I think, that these owners of the medallions have a property right in those medallions.  Yes. In fact, they could alienate them, and they did. They sold them, right? Correct. And your client, because of the appreciation and increase in value in these medallions, your client captured large transfer fees in conjunction with the sales of medallions over time, right? I'd imagine so. If a cab driver wanted to sell his medallion, you know, he'd appreciate the value. He was tired of driving. He wanted to retire, and he sold it. You got a transfer fee when he sold that medallion, which increased in value, right? It connects with the medallion. I do believe that as the law presently is situated, the taxi cab owners have a property interest in it, and that includes alienation, transfer, and all the rest. But here we're only talking about value, so I want to be clear. Well, but no, I want to talk about what your client is doing here, because your client got fees when those medallions were alienated, right? Transfer fees. I'd imagine so. I can't speak definitively on some of those. So, I mean, isn't it sort of having it both ways to allow the system where drivers rely upon the increase in medallions over time, the increase in value, and they make money transferring them, and you make money to have you just upend that system overnight by taking a new market participant and treating that new market participant very, very differently. You're hyper-regulating the cab industry, and you're barely regulating the TNCs. So, as you can imagine, I have a bit different characterization than you do in connection with that. First, I'll say that one word you use here is rely, right? And I think what is reliance here and what's appropriate reliance in connection with when these actual regulations were implemented. I don't think they can have a reasonable reliance that there will be no other market participants from this date forward for the rest of the future. I don't think that it would be appropriate to say that because there's this cap, and they even conceded, I believe, that if there's a 600 cap, that doesn't mean that's forever and always going to be a 600 cap, and that doesn't mean that there's not going to be other participants in the market. So, if the market fluctuates or contracts based on there being new market entrants or folks leaving the market, I don't presuppose, I don't think they could have reasonably presupposed that the value of their medallions would be static for all time. In fact, they're intending on it fluctuating going up, right? So, the fact that it went down, I think, does not create a cause of action in this case. Right, and I guess the point of your argument is it doesn't matter whether it's a TNC or anyone else. If the population of Newark increased and there was political pressure to increase medallions and the town fathers and mothers decided, you know, we're going to go from 600 medallions to 1,200. Correct. We have the power to do that. Even if it caused the market price of a medallion to plummet in value overnight. Correct. They still have what they always had, which is the medallion. So, there's no prohibiting the city from increasing it, right? No, not to my knowledge, and even if there was a prohibition, that doesn't impact the fact that there can be other market participants, which is the issue we have before the court today. And if after the seven-year deal expires, the city decides to not permit TNC to operate in Newark, the value of those medallions might increase quickly. Correct, and I don't imagine that they would have any issue with that. So, I think the fact of the matter here is that… It's political. I think it's, and I hate to characterize it this way, but it's a means to contract competition. I think that's really what we're talking about here, but frankly… I understand that, but I guess my initial question was to try to see if you'd acknowledge that there's competition and then there's unfair competition, and it does seem a little odd to have… I mean, the function is basically the same. There are certain differences between TNCs and cabs, certainly, but the basic function is you've got a person, a customer who wants to go from point A to point B, and a service provider willing to take that customer from point A to point B, and there does seem to be something a little unfair about hyper-regulating one provider and barely regulating the other provider. Is this it? Respectfully, Your Honor, the Seventh Circuit disagrees with exactly that point. They said there's sufficient distinctions here between taxis, cabs, and TNCs, such that it passes rational basis review. We haven't been presented with anything additional for you to reach a different conclusion here, and I'll also say that, just anecdotally, I took an Uber here today, this morning, and it is, quite frankly, very different than taking a taxi cab. I was presented with a picture of the driver on my phone. I could see where the car was actually located. It gave me a minute-by-minute, play-by-play, as the car came to where I was. It gave me the outline of the direction it was going to take me. These are all things that there's just not presently… So, is it a good price? Was it a good price? I mean, I thought so. Because if it's a good price, maybe it's a good price because the cab drivers are getting regulated up to their eyeballs, and when you're regulated up to your eyeballs, it's hard to provide as competitive a price as another provider who's barely regulated, right? Whether or not it was fair, I knew what the price was before the car arrived, and I think that's a distinction that you have to pull out of my adversary because, frankly, when I'm sitting at Newark Airport and I see fractions of miles next to monetary components and say, this is where we're going to go, they frankly don't tell me how much it's going to cost me. Your opponent would say that's a function of the regulation. You make them do that. They don't say, this is how we want to price our service. You tell them to price their service that way. The taxi cabs are not free to say, I tell you what, based on the number of cabs in the area here, I'll take you for this much money and negotiate a contract rate. You have set rates. They're posted. The city decides that they're going to be done by mileage or, in certain cases, by a flat rate. So, how is it fair or right or rational for the city to say, well, these things are completely different. You'll tell me the price in an Uber car when I get in the cab. But for the cab, when I get in the car, but when it's a cab, I have to figure it out and not know what the price is, et cetera. If you create the distinction, can you rely on the distinction as a basis for making a different kind of treatment? What I'll say is that it's not the same distinction we're discussing. The distinction I'm speaking of is the fact that there's a contract already made before the car arrives. If that wasn't the one you were speaking about, then speak to the one I just gave. Let's talk about that one. The nature of the technology that's involved with Ubers and TNCs provides that. Because of that pre-contractual relationship, I can get the price ahead of time. Taxicabs do not have that. That's a distinction, and that's a distinction that's a function of that pricing. So, I think that's why. Well, and the question I'm asking you is what I heard your opponent say when he was standing up here. Mr. Wedlinger, if I heard him right, said you can't fairly rely on that because that's a distinction that's created by the regulatory authority. The only reason that there's a difference, perhaps, in the way the pricing happens is because the city tells the cabs, you have to price this way. So, can it really be right for the city to say, you have to price this way, and then to defend itself by saying, hey, look at how differently they price each other. They're completely different. No, well, I will say that. It's circular, right? No, I would say that in connection with the equal protection analysis and the distinctions that are being made as between TNCs and taxicabs, you haven't relied on the price, frankly, in our briefing or here today, neither has the Seventh Circuit. Hold on. I thought you were. In fact, I thought I just heard you say, look, by my own experience here, let me tell you anecdotally, I got in the car and I knew the pricing information. And the Seventh Circuit indeed does that when it says there's a contract established with a price. That is one of the primary things they rely on. Right, and it's in connection with the information, not a point-to-point comparison of the pricing of the taxicabs versus the TNCs. So I think that's a meaningful distinction here. I think when I get in the car, the fact that I know the price is a function of the TNCs, it's provided by the TNCs, it's not provided by the taxicabs, and it's not pursuant to regulation. It's a function of the technology that's available in connection with TNCs and not taxicabs. Well, I thought it was indeed a function of – it's certainly on the Uber side a function of technology. They're able to do it using that app, make a statement about price.  It's a function of regulation. I assume that if cab companies were free to do it and they want it in a free and open market, maybe the cab companies would say, okay, here's what happens. They get in the car. We'll have something posted on the roof, this much money to so-and-so. Or we'll price differently. We'll use technology, too. But you don't let them do that. You regulate them in how they can do it, and they're bound by that regulation. Maybe I misunderstood, but I understood his argument to be you can't rely on that distinction because it's a function of the regulation. What's wrong with that argument? I don't think that that's the argument. I think the argument, again, that's being made is in connection with the price. We're regulating the price. And I think that's what you're saying may be unfair. But what I'm saying is that it's a function of the information that's available to the person that's getting into the car. And I think that's what the Seventh Circuit is relying on. They're saying that before you get in the vehicle, you already know who your driver is going to be. You already know how much this is actually going to cost you, irrespective of what that amount is as compared to what it would be for a taxi cab. So it's not a one-to-one comparison of what the pricing is. It's the fact that you have the information available on a pre-contractual basis. Taxi cabs are unable and cannot do that. So I think that's a meaningful distinction. Let me ask you this. When you say taxi cabs are unable to do that, you're implying that the only reason they're unable to do that is because of technology or because they won't. I hear them saying, no, no, the major reason we can't do that is not technology. It's because we're told we can't. And so it's unfair for you to listen to them when they say that's a distinction because they're making us different. The difference is you have to heal a taxi cab. There's no pre-contractual relationship. There's no way for you to know who your driver is. There's no way for there to be any discussion regarding the traveling or the price or the route before you're actually in the vehicle. That is the distinction. It's a meaningful distinction that forces, I think, there to be difference in terms of regulation, at least to the point where we're reaching rational basis here. It's a legitimate interest here. We have a right to protect our citizens in the city of Newark. We have a right to make sure that they have options available in terms of how they choose to transport themselves. So while I hear you about the pricing component, that frankly wasn't the argument that was put forth by Mr. Redinger. And I don't know if it's totally relevant here. I think what we're talking about here is the differences between taxi cabs and TNCs in connection with how the relationship starts. And, of course, you'll disagree with me that there's not a difference between a TNC, you know, you're dialing the phone, you're getting someone there, you're entering your Uber and getting someone there and hailing the cab. I think that's disingenuous. I think the Seventh Circuit saw through that argument and you should hear it as well. Frankly, when you make a hail, you don't know who you're getting into the cab with. So I think that it's important for the city to have regulations such that we know and we can try to gauge the safety for the folks that are entering these cabs. So you're saying that somebody is safer getting into an Uber because they saw the picture on their phone than they are getting into a cab where the city itself has vetted the cabbies, required the test, the various regulatory hurdles have got to step through to get the medallion. I'm not here to make a comparison as to what's better and what's not. I'm here to draw the distinction because there absolutely is a distinction. Okay, thank you, counsel. Thank you, counsel. Thank you, Your Honor. Thank you again, Your Honors. Just to address a couple of the issues that just came up. I want to focus on the hailing issue, Mr. Reitling. If someone orders up a TNC and the driver's picture comes up and it says 4.2 stars, the customer has the ability to X out that ride and look for somebody else. When a customer gets in a line at the Newark Airport to get a cab, if the customer gets in the back seat and doesn't like the look of the back seat, is the customer at liberty to reject that car and get out of the cab and say, I'll take the next one? Absolutely. Absolutely they are entitled to do that. And the information that is required by the statute to be provided by a TNC. TNCs are not just Uber. In this particular case, we were talking about an Uber agreement, but the state law is a TNC law which relates to any other companies. The only information that is required, and it's 39,5H-8, the only information that is required to be provided is a picture of the driver and the license plate number. There is no requirement that they provide the cost that the ride is going to be. There is no requirement that they provide stars as to whether or not this person was a good driver, gets good reviews, or anything. But that information is available, though. That's in the record, right? If you take an Uber, that information is available to the customer. Uber currently provides that information. What we're talking about with regard to the state law, which is now in effect, because the Newark law says specifically under the carve-out, it says on page 898 of the brief, state law rather than the terms and conditions of this agreement shall govern. So now we're talking about the state law. What are they required to provide? They're only required to provide a picture of the driver and the license plate number of the vehicle. That's it. What they do provide, that's up to the individual TNC. I've been subject to change also. I'm sorry. Are you making a direct argument against the New Jersey law, then? Is that unconstitutional? That is not a part of our brief. What I am arguing is the Newark law, pursuant to what they say, once there was a state law, they incorporate the requirements of the state law and don't make their requirements any more stringent than that. And that's what the agreement specifically says. Well, it's funny because I'm looking at the statute right now, and it says that if there are any agreements, that those agreements don't supersede the statute. So it seems that both, you know, it's kind of an odd. It's weird, but the Uber agreement with the city of Newark. Does the Uber agreement, is it considered a, quote, financial access agreement between a transportation network company and a city of first class with an international airport terminal? That's the Uber agreement, right? That's my argument. That's the only thing I can understand that I don't understand the paragraphs two before, which says that no municipality can impose a fee on a TNC. Well, you may be arguing, you may say, hey, they're not enforcing their law the way we think they should enforce their law. But for mootness purposes, I don't hear you arguing that this state law supersedes the agreement or prevents you from pursuing your claims here. Am I right? That's correct. And I think that the key is following the money. As long as Newark is getting the money, there's not a superseding. Well, what relief could we give you then if we, you know, under this law, I mean, assume the law is in effect, what relief could you get? The relief that we, first off, this was dismissed as not raising a plausible argument. This is dismissed on the pleadings. What should happen is what the relief that we're seeking is that we go back to state court, back to district court, we go through discovery, we determine what exactly my client's damages are as a result of these actions of the city of Newark, and that we then present that. Did you plead those? Did you plead the diminution in value? Absolutely. And what are they trading at now? What's the current market value of a medallion? In accordance with our pleading, I have Mr. Abbas here as one of the drivers. And in our pleadings, we specifically related to him that his revenues, and he's owned two medallions in Newark, his revenues have gone down 60% to 70% per year, and the value that he can sell the medallion has gone down over 50%. Give me real numbers. What can he sell a medallion at today? They were $500,000 a couple of years ago. He can sell it for less than $250,000. All right. So you're saying, look, he could have made a half a million if he sold the medallion. Now he makes a quarter million. He's lost 50% of his value. But isn't it true that if this agreement between Uber and the city gets jettisoned for some reason, either it expires of its own terms after seven years or there's some violation, it stands to reason that the value of your client's medallions will jump pretty quickly? If the agreement is thrown out, absolutely. My client's value goes right back up. So, I mean, you know, people buy homes. They buy assets all the time, hoping, expecting that property values will go up. I mean, this happens with housing all the time, right? When the town that somebody buys a house in does something to alter the landscape of the neighborhood, you know, they allow a loud commercial plant to come into the neighborhood, you know, you might lose 50% of the value of your home. You're saying that's a taking? Absolutely. When you're talking about the person that you're purchasing it from. What case law supports that? What case law supports the notion that when you have an asset, whether it's a home, a medallion, or anything else, that you can expect it's going to keep going up and nothing's going to happen to make it go down? You don't expect it to always go up, but I go back to the Penn Central Takings Clause standards, is basically do you have a reasonable investment-backed expectation? They had an investment-backed expectation given to them by the city of Newark. Under that theory, then, I think you have to contend that even if we had no such thing as TNCs, you're saying you would still have a case if the city of Newark passed a new ordinance that said, tomorrow we're going to issue 600, we're going to double the number of medallions, we're going to issue 600 new medallions, you're saying you still have a case? Well, we would, and it's not up to the city of Newark solely to make that determination. Why not? Because under the Newark regulations, the business administration, and there was a case involving the taxi from years ago where they tried to bring them up. The business administrator in Newark has to show a need for that. So when you say has to show a need... Yes, so I'm assuming they make the requisition and they say we're going to have 1,200 medallions. Your clients' fair market value of their medallions plummets overnight. But that's not... And you're saying that's a taking. If you couple it with, and this is really important, and it's somewhat convoluted, but it's important. If you couple it with the person that you're giving the other 600 to is, number one, not subject to the same cost regulations, not subject to the price regulations... My hypothetical is it's the same. It's the same. If it's the same, I would... You're saying you don't have a case. If they issued 600 new medallions tomorrow, which you agree, we all agree, basic law and economics would cause the fair market value of medallions to plummet overnight, you're saying you don't have a case because they're being regulated the same way. I would say that you have less of a case. They certainly had a value that was given to them by the city of Newark. The very same expectation of holding on to the inherent value of that medallion, that's perfectly parallel, it seems to me, whether you double the number of tax and medallions or whether you allow a new entrant like TNCs. Well, I would argue, and that's up for a judge because it's not a bright line under the standard, that's up to a judge to make that determination as to whether or not that value is beyond the expectation. That was the Minneapolis taxi case, right? And they lost because Judge Malloy said in that case, you don't have an exclusive right. You got a medallion, gave you the right to take people. It was never promised to you and you had no reasonable expectation that that number of medallions would never be increased. And I understand that ruling. Our problem is threefold. We've got the medallions essentially being increasing the number of medallions because that's essentially by allowing Uber to operate. We're increasing the number of medallions. Second, you're controlling our price so they can undercut at any point, advertising our price whereas they're entitled to confidentiality, and you're regulating us to the point where we have to have our cars inspected twice a year. We have to have insurance all the time whereas they don't. All of these costs. So you gave us something. We paid you. We pay you every year for our right to do that. And now what you're doing is you're allowing a competition to come in and absolutely giving that competition whenever they want the ability to obliterate our business. That's what you're doing by the regulation. That's what Newark is doing by this regulation, and that's unfair. Let me just have you back up a little bit. What is it? Is there a statute or a city regulation about raising? You mentioned it before. I'm just curious about it. If the city were to decide they want to issue new medallions more, what's the process? I don't know it off the top of my head. I know there's some sort of regulation, and it was attempted to be done. Is it a city or a state regulation? City. It's the city medallion. Also, just out of curiosity, and it doesn't really necessarily have anything to do with this case, but is there a political side to this too? I understand you're attacking this. You're the lawyer, and you're doing this judicially, but is there political pressure being brought to bear? Just out of curiosity. The city is getting $10 million over seven years. I don't know. I don't know what the politics behind it is. I don't know what the politics behind it is, especially to regulate essentially an airport that they don't issue tickets on, but all the tickets after they were issued by the port authority, they then go to the municipality to determine what the outcome of those tickets are, and the tickets are all gone in exchange for $1 million a year or $10 million over seven years. What the political pressure is, I don't know, and I don't want to talk to you. Okay, that's fine. All right. Well, thank you, counsel. It's a very interesting case, and we'll take it on Sunday.